UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

REGINALD NEREE,

                                        Plaintiff,

          v.                                                              9:09-CV-802
                                                                          (MAD/ATB)
LUCANN O'HARA, et al.,

                                        Defendants.

_____

REGINALD NEREE, Plaintiff *pro se*
ADELE M. TAYLOR-SCOTT, Ass't Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation on September 24, 2010, pursuant to 28 U.S.C. § 636 (b) and LOCAL RULES N.D.N.Y. 72.3(c).[1] Plaintiff's *pro se* complaint (Dkt. No. 1) seeks monetary damages and unspecified injunctive relief, under 42 U.S.C. § 1983, for alleged violations of his constitutional rights while he was confined by the New York State Department of Correctional Services ("DOCS").[2] Although the complaint suggests other alleged constitutional violations, plaintiff primarily claims that he was denied due process in connection with three disciplinary hearings conducted at the Mohawk Correctional Facility

_____

[1] The case was originally assigned to Senior District Judge Thomas J. McAvoy; but, on April 20, 2011, it was re-assigned to District Judge Mae A. D'Agostino.

[2] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

("Mohawk") in 2009.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56.  (Dkt. No. 88).  Plaintiff filed a response to the defendants' motion, and what purports to be a cross motion for partial summary judgment, seeking a finding that the defendants are liable on the due process claims. (Dkt. No. 89).  The defendants thereafter filed a reply in further support of their summary judgment motion and in opposition to plaintiff's cross motion.  (Dkt. No. 92).   For the reasons set forth below, this court recommends granting defendants' summary judgment motion, denying plaintiff's purported cross motion, and dismissing the complaint.

## I.   Factual Background

On or about April 16, 2009, DOCS forwarded a memorandum to all facility superintendents, advising them of emergency rule changes and new procedures that were to be effective immediately.  The memorandum discussed a scheme devised by inmates to use the Uniform Commercial Code ("UCC") to file liens against DOCS personnel.  The UCC liens were fraudulent, but they could seriously impact the targeted employee's credit, until successfully removed.  (Woughter Decl. ¶¶ 4, 5 & Exh. A, Dkt. No. 88-10 at 2, 8-10).[3]  In response to this scheme, the Commissioner authorized amendments to DOCS Directive 4421 ("Privileged Correspondence") to require the monitoring and review of all incoming or outgoing mail to or from the

---

[3] The court will refer to page numbers assigned by the courts' Case Management/ Electronic Case Filing system to the extent it seems necessary to reference the cited exhibit.

Secretary of State–the state agency which generally handles UCC filings.  Directive

4422 ("Inmate Correspondence Program") was also amended to prohibit inmates from

possessing UCC forms, unless they had prior written authorization from the facility

superintendent.  The amendment to Directive 4422 also authorized confiscation of

UCC forms for review by the superintendent, in consultation with DOCS counsel.  (*Id*.

¶ 6 & Exh. A, Dkt. No. 88-10 at 2, 11-12).

The April 16, 2009 memorandum provided that unauthorized UCC materials

"shall be deemed contraband," and directed that they were to be confiscated, so that

the superintendent, in consultation with DOCS counsel, could determine whether there

was a valid reason to authorize the inmate to have the UCC documents.

Superintendents were further directed:  "When any unauthorized UCC document is

found in the possession of an inmate, that inmate will be issued a written direct order

that he or she is not to attempt to file UCC Financing Statements, unless the inmate is

given prior approval from the Superintendent."  (Woughter Decl. ¶¶ 8-9 & Exh. A,

Dkt. No. 88-10 at 2-3, 9-10).  Upon receipt of the memorandum, defendant Carol

Woughter, then the Superintendent of Mohawk Correctional Facility, directed staff to

post a "Notice to Inmate Population," announcing the new rules relating to UCC

documents, in housing units and the common areas of the facility that were accessible

to inmates.  (*Id*. ¶¶ 10, 12 & Exh. B, Dkt. No. 88-10 at 3, 13-14).

On or about April 20, 2009, the mail room staff at Mohawk intercepted

incoming mail to plaintiff from the Department of State in Albany, returning UCC

documents he attempted to file.  Mail room personnel requested permission of the

3

superintendent to open those items, which was granted on April 21st. (Woughter Decl. ¶ 14 & Exh. C, Dkt. No. 88-10 at 3-4, 15-16). On April 22, 2009, the mail room intercepted an additional piece of incoming correspondence to plaintiff, from the Pennsylvania Department of State, returning another attempted UCC filing. Mail room personnel requested permission to open that item, which Superintendent Woughter granted. (*Id.* ¶ 15 & Exh. D, Dkt. No. 88-10 at 4, 17-18). In accordance with the April 16, 2009 DOCS memorandum, defendant Woughter forwarded the contents of both pieces of UCC-related correspondence to the Deputy Commissioner and Counsel for DOCS. She directed the Mohawk security staff to advise plaintiff that UCC materials were contraband and to give plaintiff a direct order not to be in possession of such materials without written authorization from the superintendent. (*Id.* ¶¶ 16-18 & Exh. E, Dkt. No. 88-10 at 4, 19-20).

On April 22, 2009, defendant Jeffrey Cianciola advised plaintiff that two pieces of his mail, containing UCC documents, were intercepted and confiscated, and that plaintiff would need to request permission from the superintendent to receive those documents. According to Sgt. Cianciola, he gave plaintiff a direct, oral order not to use or be in possession of UCC forms without permission from the superintendent. (Cianciola Decl. ¶¶ 5-7 & Exh. A, Dkt. No. 88-3). As discussed further below, plaintiff disputes defendant Cianciola's characterization of that "order," and he otherwise claims that he did not have proper notice of the change in the DOCS rules relating to UCC documents.

On May 6, 2009, defendant Lucann O'Hara found plaintiff at a photocopier at

Mohawk in possession of multiple copies of two blank UCC forms. (O'Hara Decl. ¶¶ 6-12, 19-20, Dkt. No. 88-7). Knowing of the new DOCS rules treating UCC forms as contraband, Counselor O'Hara consulted with her supervisor, defendant Shelley Engresser, and then issued plaintiff a misbehavior report. (*Id*. ¶¶ 13-21 & Exh. A). A Tier III disciplinary hearing on the May 6th misbehavior report was conducted before defendant Jerald T. Steele on May 12, 2009. Defendant Steele found plaintiff guilty of all but one charge of misconduct, and sentenced plaintiff to six months in the Special Housing Unit ("SHU"), with three months suspended, and a corresponding loss of privileges. (Steele Decl. & Exhs. A, B, Dkt. No. 88-8).

On or about May 19, 2009, Counselor O'Hara found, secreted away in the Transitional Services clerk's office, a UCC-11 form with plaintiff's name and DIN number written on the top, in what she recognized as plaintiff's handwriting. At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24-29). Defendant O'Hara issued a second misbehavior report against plaintiff dated May 19, 2009 for being in possession of contraband, and for disobeying Sgt. Cianciola's direct order. (*Id*. ¶¶ 30-33 & Exh. C).

On May 28, 2009, defendant Ted Fauss conducted a Tier III hearing with respect to the May 19th misbehavior report against plaintiff. Education Supervisor Fauss found plaintiff guilty of both charges and imposed a penalty of six months in the SHU, with a corresponding loss of privileges. This penalty was enhanced by the

reinstatement of the three-month penalty suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months.  (Fauss Decl. & Exhs. A, B, Dkt. No. 88-6).

On or about May 26, 2009, plaintiff filed a grievance against Counselor O'Hara, claiming, *inter alia*, that her two misbehavior reports were unfounded and "retalatory [sic]."  (O'Hara Decl. ¶¶ 34-35; Woughter Decl., Exh. L, Dkt. No. 88-10 at 36-38). Following an investigation, Superintendent Woughter denied the grievance, finding that Counselor O'Hara acted in good faith and that the disciplinary charges against plaintiff had been sustained.  (Woughter Decl. ¶¶ 26-30 & Exh. L, Dkt. No. 88-10 at 35, 39-46).  Plaintiff admittedly did not complete the appeal of the denial of his grievance.  (Pltf. Dep. at 103, Dkt. No. 88-11 at 106; Woughter Decl. ¶ 31).

On May 19, 2009, following several incidents demonstrating plaintiff's involvement with UCC materials, Superintendent Woughter issued a mail watch memorandum, authorizing the mail room staff at Mohawk to open and read all of plaintiff's incoming and outgoing mail for a period of 30 days.  (Ciotti Decl. ¶¶ 4-8 & Exh. B, Dkt. No. 88-4 at 2, 13-14).  On or about May 29, 2009, the mail room staff intercepted correspondence from plaintiff that was later opened by defendant Gabriel Ciotti, in accordance with Superintendent Woughter's mail watch authorization.  The correspondence, addressed to plaintiff's brother, appeared to Lt. Ciotti to contain directions to forward, to third persons, written instructions for filing UCC statements on plaintiff's behalf.  (*Id.* ¶¶ 9-14 & Exh. C; St. Louis Decl., Exh. B at 17-18, Dkt. No. 88-9 at 38-39).  Upon discovery of the content of this correspondence, Lt. Ciotti

6

confiscated the documents and issued a third misbehavior report against plaintiff.  (*Id.* ¶ 16 & Exh. E).

On June 8 and 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to plaintiff's May 29th misbehavior report.  Capt. St. Louis found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU and the related loss of privileges.[4]  (St. Louis Decl. & Exhs. A, B).

Plaintiff appealed the results of the three disciplinary hearings, which were affirmed by the DOCS Special Housing and Inmate Disciplinary Programs, directed by Norman Bezio.  (Bezio Decl. & Exhs. A-C, Dkt. No. 88-2).  However, because of the penalties imposed in connection with the first two disciplinary proceedings, Director Bezio reduced the duration of the penalties on the final misbehavior report from twelve to six months.  (*Id.* ¶ 56 & Exh. C, Dkt. No. 88-2 at 12, 37-38).  While defendant Bezio calculated the total SHU sentence imposed on plaintiff in connection with the three disciplinary hearings to be 15 months, it appears to the court that the total SHU term imposed, after the reduction on the final misbehavior report, was 18 months–from May 6, 2009 to on or about November 6, 2010.  (Steele Decl., Exh. A, Dkt. No. 88-8 at 8; Fauss Decl., Exh. A, Dkt. No. 88-6 at 7; St. Louis Decl., Exh. A, Dkt. No. 88-9 at 7; Bezio Decl., Exh. C, Dkt. No. 88-2 at 37).

---

[4] Plaintiff was also sentenced to a loss of twelve months of good time, which was later reduced to six months.  (St. Louis Decl., Exh. A, Dkt. No. 88-9 at 7; Bezio Decl., Exh. C, Dkt. No. 88-2 at 37).  In order to avoid dismissal of certain Section 1983 claims pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), the plaintiff waived any due process claims relating to the loss of good time.  (Dkt. No. 22 at 3-6; Dkt. No. 25).  Based on that waiver, Judge McAvoy dismissed all claims in the complaint relating to the loss of good time credits.  (Dkt. No. 39 at 2).

## II.    Contentions and Summary of Recommendations

Plaintiff's complaint names nine defendants, apparently both in their individual and official capacities[5]–Counselor O'Hara, Director Bezio, former Lt. Ciotti, Educational Supervisor Fauss, Supervising Counselor Engresser, Facility Steward Steele, Capt. St. Louis, Sgt. Cianciola, and former Mohawk Superintendent Woughter. Construed liberally, the plaintiff alleges that he was deprived of due process in connection with the three disciplinary hearings against him because (1) the amended DOCS directives involving UCC materials, which provided the basis for most of the disciplinary charges, violated his First Amendment rights and were not properly promulgated by DOCS; (2) some of the disciplinary charges against him were based on surveillance of his mail that violated his First Amendment rights; (3) he did not have proper notice of the amended rules relating to UCC materials, on which the disciplinary charges were based; (4) the procedures followed during the disciplinary hearings failed to satisfy applicable due process requirements; and (5) there was not

---

[5]  It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (*citing Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87-88 & n.1 (2d Cir. 1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2d Cir. 1999). Plaintiff's request for unspecified injunctive relief against DOCS officials at Mohawk was largely mooted by his subsequent transfer to another facility. The Second Circuit has held that an inmate's request for prospective injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See, e.g., Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976). In any event, plaintiff's conclusory claim for injunctive relief would be insufficient to survive summary judgment, particularly because the court has found no violation of plaintiff's constitutional rights.

adequate evidentiary support for some of the disciplinary charges on which he was found guilty.  The complaint may also suggest a claim that the first two misbehavior reports against him were issued by defendant O'Hara in retaliation for plaintiff's exercise of unspecified, protected First Amendment conduct.

Defendants argue that plaintiff's claims are barred as a result of plaintiff's failure to exhaust his administrative remedies by filing or appealing grievances related to his claims.  They assert that the direct orders given to plaintiff regarding the new restrictions on UCC materials overcome his claim of lack of notice of the amended disciplinary rules.  Defendants argue that plaintiff was afforded all of the process due in connection with his disciplinary hearings, and that the alleged technical defects in the proceedings fail to establish valid constitutional claims.  The defendants assert that plaintiff's retaliation claim lacks any factual basis.  Finally, the defendants claim that they are entitled to qualified immunity from plaintiff's various causes of action.

The court finds that, although plaintiff's failure to pursue grievances may bar certain causes of action (including his retaliation claim), plaintiff exhausted his administrative remedies with respect to due process claims relating to his disciplinary hearings by appealing the results of each hearing.  The court concludes that the amended DOCS rules regarding UCC materials did not violate the First Amendment rights of plaintiff or other inmates or, in the alternative, that corrections officials who applied the amended rules are entitled to qualified immunity.  Plaintiff may not challenge the outcome of his disciplinary hearings based on objections to the legality of the monitoring and confiscation of his mail.  The court finds that there is no

9

material issue of fact with respect to whether plaintiff had adequate actual notice of the effect of the new rules relating to UCC materials or, again, in the alternative, the defendants who applied those rules to him are protected by qualified immunity. Finally, the court concludes that no reasonable fact finder could conclude that there was inadequate evidentiary support for the disciplinary charges against plaintiff or that the procedures followed in connection with the hearing did not meet the applicable due process standards.  Accordingly, the court recommends that defendants' motion for summary judgment be granted and the complaint dismissed, in its entirety.  The court further recommends that plaintiff's purported cross motion for partial summary judgment be denied.

## III.  **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56[6]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56 (c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments

that they suggest")).[7]  "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

## IV.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

---

[7] The plaintiff filed at least 15 submissions that purport to "supplement" or support his complaint.  (Dkt. Nos. 8, 10, 12-20, 27, 31-33).  Only one submission was identified as a motion to amend (Dkt. No. 31), and this court ruled that it was not a proper pleading because it sought to add allegations to the complaint, rather than replace it with a complete amended complaint. (Dkt. No. 39 at 5-6).  While the court will not treat these various "addendums" as part of the complaint, it will consider them to the extent they clarify allegations in the complaint or are relevant to the determination of whether there are genuine issues of material fact relating to the pending summary judgment motions. The court believes that this approach is consistent with the Second Circuit's standards for construing a *pro se* pleading.

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

Defendants allege that plaintiff failed to exhaust his administrative remedies in this case because he filed only one grievance relating to any of the claims in the complaint, and failed to complete the administrative process by appealing the denial of his grievance by the superintendent to the Central Office Review Committee (CORC). The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC).  N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the CORC.  *Id*. § 701.5(d).

Pursuit of a grievance is the appropriate administrative remedy for most complaints by inmates.  However, complaints about the handling of a disciplinary hearing by corrections officials are non-grievable under applicable regulations because there is a separate administrative appeal process for disciplinary actions.  *Id*. § 701.3(e)(1); *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009).  Plaintiff properly exhausted his administrative remedies, at least with respect to his due process claims

13

relating to his disciplinary hearings, by appealing the result of each hearing. *Davis v. Barrett*, 576 F.3d at 132-33.  However, because plaintiff failed to fully pursue grievances with respect to other claims, such as his allegation that defendant O'Hara retaliated against him by filing the first two misbehavior reports, those claims are barred for failure to exhaust administrative remedies.[8]

In *Giano v. Goord*, the Second Circuit excused an inmate's failure to file a grievance regarding a complaint that a correction officer initiated a retaliatory and unfounded disciplinary charge against the prisoner.  The Court held the plaintiff reasonably misinterpreted DOCS regulations to mean that his only administrative recourse with respect to this complaint was to appeal his disciplinary conviction. *Giano v. Goord*, 380 F.3d at 676, 679 (holding that Giano's failure to exhaust with respect to the retaliation claim was justified).[9]

---

[8] In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).  Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) .  The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett*, 343 F.3d at 137.  We agree with the defendants that plaintiff's conclusory retaliation claim (7/20/2009 Addendum, Dkt. No. 8 at 1) would not survive summary judgment, even if plaintiff had exhausted his administrative remedies with respect to this claim.  Moreover, plaintiff has not identified any protected activity that preceded defendant O'Hara's initiation of the two misbehavior reports.  Plaintiff's grievance against defendant O'Hara, which would constitute protected conduct, was filed followed the initiation of both disciplinary charges.  As discussed in section V.A. below, plaintiff's activities involving UCC materials are not protected by the First Amendment in the prison setting.

[9] At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or

The plaintiff in this case, unlike Giano, actually filed a grievance with respect to his complaint of retaliation by defendant O'Hara, indicating that he understood that this was the proper administrative process to pursue with respect to that complaint. The Superintendent's denial of the grievance, included a notice of plaintiff's right to appeal to CORC.  (Woughter Decl., Exh. L, Dkt. No. 88-10 at 35).  In later admitting that he did not appeal the denial of his grievance, plaintiff did not claim any confusion about the appropriate administrative remedies or any other special circumstances; he merely stated that the DOCS grievance system is "fruitless."  (Pltf. Dep. at 106).  In similar circumstances, the Second Circuit has held that an inmate could not rely on *Giano* to excuse his failure to exhaust the grievance process with respect to a claim that a claim of retaliation against an officer for filing an unfounded disciplinary charge. *Reynoso v. Swezey*, 238 Fed. Appx. 660, 663 (2d Cir. 2007) (where plaintiff

---

excused.  *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).  Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*  Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation. See, e.g., *Newman v. Duncan*, 04-CV-395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe*, 655 F. Supp. 2d 274, 285-86 n.7 (S.D.N.Y. 2009).  Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in several post-*Woodford* cases.  *See, e.g., Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007); *Davis v. State of New York*, 311 Fed. Appx. 397, 399 (2d Cir. 2009).

filed a grievance with respect to the retaliation claim, but failed to appeal the denial to CORC, his failure to exhaust was not excused in light of evidence of his awareness that the grievance process was the appropriate administrative remedy).

## V.      Challenges to Amended DOCS Rules Re: UCC Materials

### A.      First Amendment Challenge

Plaintiff claims that the restrictions on UCC materials adopted by DOCS in 2009, on which many of the disciplinary charges against him were based, were invalid because they infringed on his First Amendment rights and those of other inmates. "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely*, 482 U.S. 78, 84 (1987)).  Plaintiff's claims that DOCS' policies regarding UCC materials are invalid on First Amendment grounds must fail because they are reasonably related to legitimate penological interests. *Turner v. Safely*, 482 U.S. at 89.

The Supreme Court in *Turner* articulated several factors to guide judicial review of the validity of prison regulations.  First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id*.  Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates." *Id*. at 90.  Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources

16

generally." *Id*.  Finally, courts should assess the challenged regulation in relation to proposed alternatives.  *Id*.  "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."  *Id*.  However, prison administrators are not required to use the least restrictive means possible to further legitimate penological interests.  *See Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989).

In 2008, the Third Circuit rejected First Amendment and other constitutional challenges to Pennsylvania Department of Corrections ("DOC") regulations, similar to the New York DOCS rules involved here, which restricted inmates' possession and use of UCC materials.  *Monroe v. Beard*, 536 F.3d 198, 207-209 (3d Cir. 2008); *Edmonds v. Sobina*, 296 Fed. Appx. 214, 217-18 (3d Cir. 2008).  These cases persuasively documented that such regulations satisfied the *Turner* standards.  *Id*. *Edmonds* dismissed a Section 1983 due process claim relating to prison disciplinary charges brought under the DOC UCC rules.  *Edmonds*, 296 Fed. Appx. at 216.

The DOCS restrictions on inmate possession of UCC materials, like those Pennsylvania regulations upheld by the Third Circuit, are "reasonably related to the [corrections agency's] interest in protecting government officials from fraudulent liens."  *Edmonds*, 296 Fed. Appx. at 217 (quoting *Monroe*, 536 F.3d at 208).  Courts, including some in this Circuit, have recognized the serious problem of prison inmates filing fraudulent and abusive UCC liens against government officials.  *See Monroe*, 536 F.3d at 202 n.2 (citing, *inter alia*, *United States v. Speight*, 75 Fed. Appx. 802 (2d

17

Cir.2003) (affirming judgment of conviction against defendant-inmates claiming that government officials owed them multi-million dollar debts and filing fraudulent liens to obtain those "debts")); *Bartz v. Van de Graaf*, 1:07-CV-219, 2008 WL 2704882, at *2 (D. Vt. July 8, 2008) ("[t]he abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented") (citations omitted).

The DOCS rules relating to UCC materials, like the Pennsylvania regulations upheld in *Monroe* and *Edmonds*, do provide inmates like plaintiff with alternate means of exercising First Amendment rights.  The DOCS rules and the Pennsylvania regulations both provided inmates with an opportunity to persuade prison officials that they had a valid and legitimate interest in possessing or using UCC materials. *Monroe*, 536 F.3d at 204, 209.  Given that New York inmates are legitimately restricted in engaging in business activities from prison,[10] substantially limiting the circumstances under which the possession of UCC forms would be allowed is reasonable and appropriate.

---

[10] The Second Circuit found a "valid, rational connection" between DOCS Directive 4422, which allows prior inspection of inmates' commercial mail, and the legitimate governmental interests that the directive was designed to promote.  *See Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir.1987).  The Second Circuit concluded that Directive 4422 served "to prevent inmates from committing fraud on businesses or from obligating funds beyond their means."  *Id*. As such, the regulation promoted the penological objectives of "security, order, and rehabilitation."  *Id*.  Other courts in this Circuit have similarly rejected a First Amendment challenge to DOCS Rule 103.20, which prohibits inmates from soliciting goods or services from any business without the approval of the superintendent.  *Jordan v. Garvin*, 01CIV4393, 2004 WL 302361, at *3-4 (S.D.N.Y. Feb. 17, 2004).

As the Third Circuit recognized, accommodating the plaintiff's asserted right to use UCC documents would have a substantial negative impact on prison administration and security.  "[A]ccommodating the plaintiffs' right to possess these materials may encourage them to harass, intimidate or threaten prison officials . . . by threatening to file liens."  *Monroe*, 536 F.3d at 209.

As to alternatives to the DOCS rules, plaintiff suggests that confiscation of his UCC materials was unreasonable unless there was evidence that he was in fact, filing fraudulent liens.  (Pltf. Dep. at 88).  Like the Third Circuit in *Monroe*, this court rejects this alternative.  Given the difficulty of removing a fraudulent UCC lien and the very disruptive effect that can have on a government official, DOCS should not be required to wait until a prisoner actually files a fraudulent lien.  *Monroe*, 356 F.3d at 209 ("requiring the DOC to accommodate plaintiffs right by adopting a 'wait and see' approach, rather than by the pre-emptive measures they employed in this case, would impose more than a '*de minimis*' cost to prison officials.")  There are clear indications that plaintiff's UCC materials were consistent with the fraudulent UCC schemes employed by other inmates,[11] and no reasonable fact finder would credit his patently incredible claims of innocent intentions.  (Pltf. Dep. at 66-68, 73-75).  Given that

---

[11] Plaintiff admitted creating a UCC document which listed the names of various law enforcement or corrections officials, including the Commissioner of DOCS and Superintendent Woughter.  (Pltf. Dep. at 53-54; Fauss Decl. ¶ 17).  Moreover, in one of his "supplemental" submissions, plaintiff attached copies of UCC documents that were seized in the Mohawk mail room in April 2009.  (9/3/09 Addendum, Dkt. No. 32).  These documents would clearly serve no legitimate business or other purpose, and, as plaintiff acknowledged (Pltf. Dep. at 67-68), were part of the "redemption" process.  Plaintiff's use of straw names in the UCC forms, and his apparent efforts to copyright those names, are consistent with the fraudulent "redemptionist" scheme common among inmates around the country.  *See Monroe*, 536 F.3d at 203 n.4.

19

prison regulations are not required to employ the "least restrictive means" to further penological purposes, the DOCS regulations are valid under *Turner v. Safely* and were properly relied upon in bringing disciplinary charges against the plaintiff.

The Sixth Circuit, in reviewing a preliminary injunction issued against a Michigan prison regulation prohibiting receipt of mail involving certain UCC materials, found that the plaintiff was likely to succeed on his First Amendment challenge to the regulation. *Jones v. Caruso*, 569 F.3d 258, 266-75 (6th Cir. 2009). The *Jones* panel found that the UCC materials did not constitute "legal mail" to which heightened First Amendment scrutiny applied. However, over a strong dissent, Judge Cole found that the Michigan regulation was unlikely to withstand scrutiny under the *Turner v. Safely* standards.

This court is more persuaded by the reasoning of the Third Circuit in *Monroe* and *Edmonds* than by the contrary ruling of the Sixth Circuit. In any event, because of the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed this particular area, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment. Accordingly, as discussed further below, the defendants who applied these rules in the context of the disciplinary actions against plaintiff, would be entitled to qualified immunity, even if it were eventually determined that the rules were constitutionally infirm.

### B.     Challenge Based on State's Alleged Delay in Filing Amended Rules

The plaintiff has claimed that the changes in the DOCS Directives, on which the

disciplinary charges against him were largely based, were not filed with the New York Secretary of State until May 16, 2009. (Complaint, Dkt. No. 1-3 at 7; 8/4/09 Addendum, Dkt. No. 16 at 4, Dkt. No. 16-3 at 6). He has argued, based on New York state authority which holds that a DOCS rule must be filed with the Secretary of State before it can be relied upon to support disciplinary charges against an inmate, that the amended rules regarding UCC filings could not have been applied against him for any conduct before May 16, 2009. (8/4/09 Addendum; Dkt. No. 16 at 2-3, citing *Jones v. Smith*, 64 N.Y.2d 1003, 489 N.Y.S.2d 50 (N.Y. 1985) (the filing of rules and regulations serves to fulfill the notice component of due process)). Some of the documents submitted or seen by plaintiff indicate that the disciplinary rules applied to plaintiff were, in fact, filed on **April** 16, 2009, before he was disciplined under them. (8/25/09 Addendum, Dkt. No. 27 at 7; Pltf. Dep. at 48-49). In any event, after the New York Court of Appeals decided *Jones v. Smith*, the Second Circuit held that the procedural failure to file a rule or regulation, in violation of New York State law, is not alone sufficient to establish a federal due process violation when an inmate is disciplined under the unfiled rule or regulation. *LaBoy v. Coughlin*, 822 F.2d 3, 4-5 (2d Cir. 1987).[12]

### C.    Imputed Vagueness Challenge

Although it is debatable whether plaintiff even alluded to the issue, Second Circuit authority suggests a possible vagueness challenge to the change in DOCS

---

[12]   Due process does require proper notice to an inmate of disciplinary rules in some fashion. *See, e.g., Frazier v. Coughlin*, 850 F.2d 129, 130 (2d Cir. 1988). As discussed below, plaintiff did receive ample actual notice of the disciplinary rules applied to him.

disciplinary policies relating to UCC filings.  DOCS implemented the changes by enacting emergency amendments to two DOCS Directives and issuing memoranda/ notices to DOCS staff and inmates about the impact of the amendments.  Plaintiff was disciplined under general DOCS disciplinary rules involving contraband and ignoring direct orders, which had not been amended, but whose scope had been purportedly altered by the changes in the DOCS directives and explanatory memoranda.

In *Chatin v. Coombe*, the Second Circuit considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent" was unconstitutionally vague as applied to silent, individual prayer.  186 F.3d 82, 84 (2d Cir.1999) (quoting DOCS Rule 105.11).  The panel found that the rule was vague, rejecting DOCS' argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule.  *Id*. at 87-89, 91.  *Chatin* held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct.  *Id*. at 88-89.

In *Farid v. Ellen*, an inmate was charged with violating, *inter alia*, the prison's general ban on contraband (DOCS Rule 113.23) as a result of his possession of a pamphlet criticizing New York's parole policies.  593 F.3d 233, 237-38 (2d Cir. 2010).  DOCS argued that the pamphlet constituted contraband because it violated the bylaws of the prison-approved organization, which included the plaintiff as a member, and which produced the pamphlet.  The Second Circuit agreed with the District Court "that these rules were unconstitutionally vague as applied to Farid, both because they

22

failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them." *Farid v. Ellen*, 593 F.3d at 241.  Relying heavily on *Chatin*, the *Farid* panel reasoned:

> There is nothing in the rule indicating that materials which violate a prison organization's internal by-laws are contraband in violation of the prison's rules . . . . Accordingly, unless [Farid] had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

*Id*. at 241-42 (emphasis in the original).

*Young v. Goord*, distinguishes *Chatin* and would undermine a vagueness or due process challenge to the application of the amended DOCS policies on UCC materials to the plaintiff under the facts of this case.  *Young v. Goord*, 192 Fed. Appx. 31, 33-34 (2d Cir. 2006).  In 1997, pursuant to the current version of a DOCS directive, Young applied for and received an exemption from DOCS' beard-length policy based on his documented affiliation with the Rastafarian Church. On August 28, 2000, correctional officer Crum gave Young a memorandum indicating that DOCS directives had been revised to reflect a change in federal law, and then ordered Young to trim his beard. When Young refused, he was issued a misbehavior report; but no discipline was imposed because, prior to the encounter with Officer Crum, Young did not know that he was now required to take other steps to become exempt from the beard-length policy.  After this hearing, Young twice disobeyed direct orders to trim his beard, and was disciplined under the revised rules.  *Id.* at 33.

While the panel did not decide whether the subsequent discipline of Young satisfied the notice requirement of due process, it ruled that the defendants involved

with disciplining the inmate after the first misbehavior report was dismissed, were

protected by qualified immunity.

> Defendants would have been further justified in believing that the first
> hearing provided Young more than "fair warning of what was proscribed"
> before he was disciplined, . . . because its disposition informed Young
> personally that DOCS considered his beard length no longer permissible.  These
> officials could reasonably believe that their actions comported with our decision
> in *Chatin* because they personally notified Young, before he was disciplined, of
> the change effected by the revised Directive and an implementing
> Memorandum; they did not expect Young himself to "reconcil[e] the text" of
> these different documents. *Chatin*, 186 F.3d at 89.
>
> If Young was entitled to any further process of law before discipline was
> justified–and on that issue we express no opinion–that right was certainly not
> "clearly established" by the time of the challenged actions. That being so, the
> defendant officials are entitled to qualified immunity from suit.

*Young v. Goord*, 192 Fed. Appx. at 34.  As discussed further below, no reasonable

juror could conclude that the plaintiff in this case did not receive ample actual notice

that his possession and use of UCC materials violated prison disciplinary rules, as

modified.  Accordingly, either the application of these rules to discipline plaintiff

would not violate his due process rights; or, at a minimum, the defendants who

applied the rules reasonably believed they were not violating any of plaintiff's clearly

established rights, and were entitled to qualified immunity.[13]

---

[13] In *Farid v. Ellen*, the Second Circuit reversed the district court's grant of summary
judgment, rejecting the finding of the lower court that the defendants in that case were clearly
entitled to qualified immunity.  593 F.3d at 246-47.  In doing so, the panel ruled that, "in light of
*Chatin*, a jury could very well decide that it is unreasonable for a prison official to act on the
belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner
to discipline under the prison's rules."  *Id.*  However, in this case, as in *Young v. Goord*, the
plaintiff inmate had actual, personal notice that provided "other reasons to know that what he did
was against *prison* rules. . . ."  *Farid v. Ellen*, 593 F.3d at 242.  Hence, *Farid* and *Chatin* are
distinguishable and the defendants in this case are entitled to a grant of summary judgment based
on qualified immunity.

## VI.    Challenge to DOCS' Confiscation and Use of Plaintiff's Mail

The plaintiff has argued that some of the disciplinary charges against him were unlawfully based on mail that was improperly opened and confiscated by DOCS. (Pltf. Cross Motion, Dkt. No. 89-1 at 2-3.)  However, even if the confiscation of plaintiff's mail was contrary to DOCS Directives or unconstitutional, plaintiff's letters would not be subject to suppression, and could be considered in the context of a prison disciplinary hearing.  *See, e.g., Dillhunt v. Theriault*, 9:07-CV-0412 (GTS/DEP), 2009 WL 4985477, at *15 (N.D.N.Y. Dec. 15, 2009) (the "fruit of the poisonous tree doctrine," which applies to evidence that is unconstitutionally obtained during a criminal investigation, has no applicability to prison disciplinary hearings) (citing *Rabb v. McMaher*, No. 94-CV-614, 1998 WL 214425, at *7 (N.D.N.Y. Apr. 24, 1998) (Pooler, J.)).  *See also United States v. Green*, No. 92-CR-159C, 1994 WL 178139, at *5-6 (W.D.N.Y. Feb.10, 1994) (Curtin, J.) (in the context of a criminal case, evidence from a mail watch may be introduced even though it was implemented in violation of DOCS Directive 4422).

Plaintiff's complaint could be construed as raising a separate First Amendment challenge to the confiscation of his mail by prison officials, pursuant to the amended UCC policies and/or the mail watch subsequently ordered by former Superintendent Woughter.  For the reasons discussed above, plaintiff failed to exhaust his administrative remedies with respect to any such claim by failing to pursue a grievance.  A general First Amendment challenge to the validity or application of mail policies, as opposed to a due process challenge to the use of confiscated mail in a

disciplinary hearing, would not be exhausted by an appeal of the disciplinary hearing.

In any event, as discussed above, the DOCS rules relating to UCC materials, including the provisions relating to the confiscation and review of mail to or from a Secretary of State, do not violate the First Amendment. Moreover, the 30-day mail watch ordered by defendant Woughter would withstand First Amendment scrutiny.

An inmate's right "to the free flow of incoming and outgoing mail" under the First Amendment[14] must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins*, 297 F.3d 108, 112-13 (2d Cir. 2002) (citing, *inter alia*, *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir.1996)). Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely*, 482 U.S. at 89. The Second Circuit has held that "'where good cause is shown, [even] outgoing mail can be read' without violating inmates' First Amendment rights." *Workman*, 80 F.3d at 698 (quoting *Wolfish v. Levi*, 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom.*, *Bell v. Wolfish*, 441 U.S. 520 (1979)). Given the several documented incidents involving plaintiff's possession and mailing of highly suspect UCC materials, the imposition of a mail watch for a limited time was clearly justified under the First Amendment. *See, e.g.*,

---

[14] *LeBron v. Swaitek*, No. 05-CV-172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).

26

*Jackson v. Portuondo*, 9:01-CV-00379 (GLS/DEP), 2007 WL 607342, at *6 -7, 13 (N.D.N.Y. Feb. 20, 2007) (granting summary judgment on claim challenging mail watch, which was supported by prior evidence that inmate was engaged in mail violations and activities involving contraband) (citing, *inter alia, United States v. Felipe*, 148 F.3d 101, 107-108 (2d Cir. 1998) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence)).

## VII.   Due Process Claims Relating to Plaintiff's Disciplinary Hearing

### A.   Legal Standards

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest[15] include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence

---

[15] In order to begin a due process analysis, the court must determine, *inter alia*, that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335–36 (2d Cir. 1998). The defendants have assumed, *arguendo*, that the penalties imposed as a result of the three disciplinary hearings–at least 15 months in SHU–were sufficiently substantial to entitle him to due process. (Deft.s' Memorandum of Law at 15, Dkt. No. 88-12 at 15). *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.")

upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).  The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations.  *See, e.g., Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation)*; Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).  To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing.  *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429-31 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

An inmate's right to assistance with his disciplinary hearing is limited.  *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993).  An assistant has been held to be constitutionally necessary in cases in which a plaintiff is, *e.g.*, confined in SHU, and therefore, unable to marshal evidence and present a defense. *Id*. (citation omitted).  In those cases, the assistant must do what the plaintiff would have done if he were able.

*Id*. *See also Jackson v. Johnson*, 30 F. Supp. 2d 613, 619 (S.D.N.Y. 1998) (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases).

## B.   The First Disciplinary Hearing

On May 6, 2009, defendant O'Hara observed plaintiff photocopying documents from a folder at the copier for the Transitional Services office at Mohawk, where plaintiff worked.  A week before, Counselor O'Hara had been advised by her supervisor, defendant Engresser, to oversee plaintiff's use of the office copy machine more closely.  (O'Hara Decl. ¶¶ 4-7, Dkt. No. 88-7).  When Counselor O'Hara asked plaintiff what he was copying, he reportedly told her that he was making copies for Transitional Services.  Counselor O'Hara looked at the materials in plaintiff's possession and noticed that they appeared to be UCC materials that she did not recognize as part of the Transitional Services curriculum.  Counselor O'Hara challenged plaintiff about copying unauthorized materials and confiscated the folder and the documents on the copier.  At that point, plaintiff admitted to defendant O'Hara that the UCC forms were his, and that he was replacing his supply because his UCC materials had been confiscated by the superintendent.  (*Id*. ¶¶ 8-12).

Counselor O'Hara issued a misbehavior report, endorsed by defendant Engresser, charging plaintiff with disobeying a direct order, in violation of DOCS Rule 106.10; lying, in violation of Rule 107.20; being in possession of documents not authorized by the superintendent, in violation of Rule 113.23; and misuse of state

property for making unauthorized photocopies, in violation of Rule 116.10.  (O'Hara Decl. ¶ 21 & Exh. A).  On May 12, 2009, defendant Steele presided over a Tier III disciplinary hearing relating to the May 6th misbehavior report.  (Steele Decl. ¶¶ 10-27 & Exh. B, Dkt. No. 88-8).

Prior to the hearing, plaintiff waived his right to inmate assistance, which was offered to him.  (Steele Decl. ¶¶ 7, 29, Exh. A, Exh. B at 2, Dkt. No. 88-8 at 3, 6, 10, 23).  When plaintiff objected to Sgt. Cianciola's April 22, 2009 memorandum documenting that, on that day, he had been given plaintiff a direct order not to be in possession of UCC documents, defendant Cianciola was called to testify about the oral order.  (*Id*. ¶¶ 17-20 & Exh. B at 3, 9-10).  Also testifying (by telephone) at the hearing were defendants O'Hara and Engresser.  (*Id*. ¶¶ 13, 21-22 & Exh. B at 10-17).

At the hearing, plaintiff admitted possessing UCC documents, without authorization from the superintendent, and intending to make photocopies of them.  (Steele Decl. ¶ 15 & Exh. B at 5, 7).  However, plaintiff testified that he never actually made copies of the UCC forms, and Counselor O'Hara acknowledged that she did not actually observe plaintiff copying the UCC documents.  (*Id*. ¶¶ 15, 21 & Exh. B at 5, 7, 11-12).

Defendant Steele convicted plaintiff of all charges except the misuse of state property charge involving the allegation that he copied UCC forms.  (Steele Decl. ¶¶ 25-26).  Facility Steward Steele made written findings supporting his rulings and read them in the record at the hearing. (*Id*., Exh. A & Exh. B at 18, Dkt. No. 88-8 at 9, 39).  He sentenced plaintiff to six months in SHU and a corresponding loss of privileges,

with three months of the penalty suspended.  (*Id*. ¶¶ 27-28 & Exh. A, Dkt. No. 88-8 at 5-6, 8).

As discussed above, plaintiff made several general objections to the three disciplinary actions against him, which are without factual support or legal merit. Plaintiff also asserts that his due process rights were violated, specifically in connection with the first disciplinary hearing against him, because (1) he did not have proper, prior notice of the amendment of the disciplinary rules relating to UCC materials; (2) the misbehavior report did not reference the alleged April 22, 2009 order from defendant Cianciola that plaintiff not possess UCC forms, although that was the order he was convicted of disobeying; and (3) that the evidence at trial, presumably the UCC forms that were seized from plaintiff, were not properly introduced at the hearing. (Complaint, Dkt. No. 1 at 5, 10-14; 7/30/09 Addendum, Dkt. No. 13 at 2-4; 8/6/09 Addendum, Dkt. No. 17 at 2-3).[16]  In the absence of any evidence of other due process issues with the first disciplinary hearing, the court will address only the specific objections raised by the plaintiff.

### 1.    Notice of the Change in Rules Relating to UCC Materials

Although plaintiff claims that he did not receive proper notice about the change in the DOCS disciplinary rules relating to UCC materials, no reasonable juror could conclude that plaintiff did not have ample, actual notice before the first misbehavior

---

[16] Plaintiff also asserted, with respect to each of the three disciplinary hearings, that defendant Bezio, the Director of the DOCS Special Housing and Inmate Disciplinary Programs, violated his due process rights by not correcting the alleged errors committed during the hearing. Having found no due process violations in connection with any of the hearings, no further discussion of this allegation is required.

report was issued against him.  Sgt. Cianciola testified at the disciplinary hearing that he gave plaintiff a direct, oral order on April 22, 2009 that he was not allowed to possess UCC documents without the permission of the superintendent.  (Steele Decl., Exh. B at 9-10).  Sgt. Cianciola documented his April 22nd order to plaintiff with a contemporaneous memorandum to his supervisor.  (Cianciola Decl. ¶¶ 6-8 & Exh. A, Dkt. No. 88-3).  Although plaintiff claimed at the hearing that he had not previously seen Sgt. Cianciola's memorandum, he admitted being advised by defendant Cianciola that the mail room had confiscated documents from the Secretaries of State of New York and Pennsylvania that plaintiff "can't have."  (Steele Decl., Exh. B at 3, 8).  Plaintiff also admitted writing the superintendent shortly thereafter, seeking permission to correspond with the Secretary of State, which further indicates that he had been advised of the impact of the new DOCS UCC rules.  (*Id.* at  8).

During his deposition, plaintiff testified inconsistently about what Sgt. Cianciola said to him on April 22, 2011.  At first, plaintiff admitted recalling "Sergeant Cianciola giving [him] a direct order, not to be in possession of UCC forms" on or about that date.  (Pltf. Dep. at 32, Dkt. No. 88-11).  Plaintiff later stated that defendant Cianciola gave him no direct order; he only told plaintiff he could not have his UCC materials that were confiscated from the mail room.  (*Id*. at 38, 45).

Superintendent Woughter produced two written requests from plaintiff, dated April 20 and 22, 2009, referencing the memorandum that announced the change in policies regarding UCC materials, and requesting permission to possess such documents.  (Woughter Decl, Exh. G, Dkt. No. 88-10 at 23-25).  Plaintiff's requests

show that he clearly had notice of the amendment of the rules prohibiting possession of UCC documents without the superintendent's permission.  Plaintiff acknowledged, in his deposition, that he asked for, but never received, permission from the superintendent to have UCC forms, and that he wasn't "supposed to have them in [his] possession."  (Pltf. Dep. at 44).

Based on the defendant Cianciola's sworn declaration and testimony, corroborated by his contemporaneous memorandum and other documentary evidence, plaintiff's utterly inconsistent testimony about what Sgt. Cianciola told him on April 22, 2009 would not, in this court's view, create an issue of fact.  *See, e.g.*, *Cooke v. Stern*, 9:07-CV-1292 (GLS/ATB), 2010 WL 3418393, at *5 (N.D.N.Y. Aug. 2, 2010) (in light of the overwhelming contrary evidence from a sworn affidavit and supporting documents, plaintiff's conclusory allegations of defendant's personal involvement in his job assignment are not sufficient to create a material issue of fact) (Report-Recommendation), adopted, 2010 WL 3418399 (N.D.N.Y. Aug. 26, 2010); *Benitez v. Pecenco*, 92 Civ. 7670, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).  *See also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare

circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

Sgt. Cianciola's April 22, 2009 order is not the only notice plaintiff received of the changes in the DOCS rules regarding UCC materials before he was disciplined. Plaintiff admitted that, on April 28, 2009, he reviewed the April 16th notice regarding the amendment of DOCS Directive 4422, which stated that "inmates should not be in possession of UCC materials."  (Pltf. Dep. at 47-49; Complaint, Dkt. No. 1-3 at 13; Woughter Decl., Exh A, Dkt. No. 88-10 at 12).  On May 1, 2009, Superintendent Woughter sent plaintiff a memorandum confirming that "UCC correspondence to and form the Department of State is deemed contraband" subject to confiscation.  She advised plaintiff she was reviewing, with DOCS counsel, whether he had a valid reason to possess such materials.  (Woughter Decl., Exh. H).  Based on the foregoing, this court concludes that no reasonable fact finder could conclude that plaintiff was not given more-than-adequate actual notice of the amended DOCS rules regarding UCC documents and the direct order(s) that he was not to possess such materials without the prior permission of the superintendent.[17]

---

[17] Plaintiff received further notifications of the import of the revised DOCS rules relating to UCC materials on and after May 6, 2009, but his primary claim is that he was not given proper notice prior to May 6th.  On May 6, 2009 (Woughter Decl., Exh. K) and May 19, 2009 (Ciotti Decl., Exh. D, Dkt. No. 88-4), plaintiff was given written orders not to possess or file UCC documents without the prior approval of the superintendent.

## 2.    Adequacy of the Misbehavior Report

Plaintiff alleges that defendant O'Hara's misbehavior report provided inadequate notice of the charges because it did not specifically reference the April 22, 2009 order of Sgt. Cianciola as the predicate for the charge of failing to obey a direct order.  The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 940 n. 11 (2d Cir.1977)).  However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton*, 380 F.3d at 72.

Counselor's O'Hara's misbehavior report contained considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez*, 238 F.3d at 193 (due process requires more than a conclusory charge).  While the disciplinary charge did not specifically reference Sgt. Cianciola's April 22, 2009 order, it did note plaintiff's admission that he was trying to replace UCC forms confiscated by the superintendent.  The charging document gave plaintiff adequate notice that he was accused of disobeying orders regarding the relatively recent prohibition on possession of UCC documents.  At the hearing, when plaintiff claimed that he had not received a copy of Sgt. Cianciola's

35

memorandum documenting his direct order to plaintiff, the hearing officer called defendant Cianciola to testify and gave plaintiff an opportunity to ask questions. (Steele Decl. Exh. B at 3, 9-10).  Any deficiency in the notice provided by the misbehavior report did not rise to the level of a due process violation, and plaintiff was not prejudiced in defending the charges at the hearing.

### 3.    Failure to Introduce Contraband UCC Documents

Plaintiff complains that he was denied due process because the hearing officer did not introduce the UCC documents confiscated from plaintiff by defendant O'Hara, presumably because the UCC forms were treated as contraband that should not be further circulated among inmates.  The transcript of the disciplinary hearing does indicate that the hearing officer introduced the confiscated UCC documents at the hearing.  (Steele Decl., Exh. B at 13).  In any event, the misbehavior report specifically referenced the names of the two blank UCC forms that were seized from plaintiff and the number of copies of each form taken.  (O'Hara Decl., Exh. A).  As noted above, plaintiff admitted possessing these documents and clearly demonstrated that he was aware of the nature of the forms that had been confiscated.  Even if the seized UCC documents were not physically introduced at the hearing, that would not rise to the level of a due process violation, would have had no impact on the outcome of the hearing, and would constitute harmless error.

### C.    The Second Disciplinary Hearing

On or about May 19, 2009, while plaintiff was confined in the SHU, Counselor O'Hara conducted a search of the Transitional Services clerk's office for any other

contraband UCC materials.  She found, secreted away, a UCC-11 form with plaintiff's name and DIN number written on the top, in what she recognized, by comparison to samples in plaintiff's guidance folder, as his handwriting.  At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24-29).  Upon confirming that the plaintiff did not have the superintendent's permission to possess the UCC document, and that Sgt. Cianciola had earlier ordered plaintiff not to possess UCC materials, Counselor O'Hara issued a second misbehavior report against plaintiff, dated May 19, 2009, for being in possession of contraband (DOCS Rule 113.23), and for disobeying Sgt. Cianciola's direct order (DOCS Rule 106.10).  (O'Hara Decl. ¶¶ 30-33 & Exh. C).

On May 28, 2009, Education Supervisor Ted Fauss conducted the Tier III disciplinary hearing with respect to the May 19th misbehavior report.  (Fauss Decl., Exh. B, Dkt. No. 88-6).  Prior to the hearing, plaintiff was offered inmate assistance, and he requested only that Counselor O'Hara be called as a witness.  (Fauss Decl. ¶ 8 & Exh. A, Dkt. No. 88-6 at 2-3, 9).  During the hearing, plaintiff claimed ignorance of who created the confiscated UCC document and objected to Counselor O'Hara's testimony that the document contained plaintiff's handwriting.  (*Id*., Exh. B at 5-6, 8, 11).  The hearing officer, as the Education Supervisor, was also familiar with plaintiff's handwriting, and stated, on the record, that he agreed with Counselor O'Hara's assessment of plaintiff's authorship of the seized document.  (*Id*. ¶ 13 & Exh. B at 8).

Plaintiff objected that document was discovered in the Transitional Services office at a time when he was confined in the SHU. He also argued that the document could have been created before April 17, 2009, when the DOCS rules prohibiting UCC materials came into effect. (Fauss Decl., Exh. B at 5-6, 8). The hearing officer, however, found that there was sufficient evidence on the record to find that the documents belonged to plaintiff, and that he failed to surrender them to prison officials after he was ordered, on April 22, 2009, not to possess UCC materials. (*Id*., Exh. B at 13-14, 16). Plaintiff was found guilty of both charges, and written reasons for the hearing officer's findings and the evidence relied upon were placed upon the record. (*Id*., Exh. A, Dkt. No. 88-6 at 8 & Exh. B at 17). Defendant Fauss imposed a penalty of six months in SHU and a corresponding loss of privileges. This penalty was, enhanced by the reinstatement of the three months suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months. (*Id*., Exh. A, Dkt. No. 88-6 at 7).

In addition to the general objections to all three disciplinary proceedings, plaintiff has claimed that the second disciplinary hearing violated his due process rights because (1) the hearing officer was not impartial, because "his mind was made up" (Complaint, Dkt. No. 1-3 at 17); (2) the second misbehavior report issued by defendant O'Hara related to the same conduct as her first disciplinary charge and subjected plaintiff to double jeopardy; (3) the confiscated document was created before the change in DOCS rules relating to UCC materials, so plaintiff was not given

notice that his conduct violated disciplinary rules;[18] (4) there was insufficient evidence to establish that plaintiff possessed the confiscated UCC document; and (5) that the hearing officer failed to make a written statement of the evidence supporting his guilty finding.  (Complaint, Dkt. No. 1-3 at 14-17; 8/3/09 Addendum, Dkt. No. 14 at 2-4; 8/4/09 Addendum, Dkt. No. 16-2 at 2-3 & Dkt. No. 16-3 at 2-6).

### 1.    Sufficiency of the Evidence

Plaintiff claims that there was not "substantial evidence" supporting defendant Fauss's finding that plaintiff possessed the confiscated UCC document, contrary to direct orders.  (Complaint, Dkt. No. 1-3 at 15).  Plaintiff misstates the applicable due process standard–that the hearing officer's findings be supported by "some" or "a modicum" of "reliable evidence."  Defendant O'Hara's identification of plaintiff's handwriting on the confiscated UCC document, based on a comparison of known samples from his guidance file, was adequate evidence to establish that plaintiff created the document, particularly since her lay opinion was corroborated by that of the hearing officer, who was personally familiar with plaintiff's handwriting.  *See, e.g., Lewis v. Johnson*, 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *11 (N.D.N.Y. Aug. 5, 2010) (the testimony of the complaining officer regarding the similarities that he observed in the handwriting of several threat letters and known samples of plaintiff's writing, even when not independently verified by the hearing officer, constituted "some evidence" that plaintiff authored those letters) (Report-

---

[18] At the second hearing, plaintiff did not contest the allegation that Sgt. Cianciola gave him a direct order not to possess UCC documents without the superintendent's permission. (Fauss Decl., Exh. B at 14-15).

Recommendation), adopted, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010).[19]

The handwriting evidence, indicating that plaintiff created the UCC document, was corroborated by the fact that his name and inmate number were written on the document.  Moreover, the document was found concealed in an area where plaintiff worked, shortly after he was found to be actively involved in the use and possession of other UCC forms.  Given the discretion of the hearing officer to make credibility determinations, there was at least a "modicum" of evidence supporting his finding that plaintiff constructively possessed the confiscated UCC document.  Plaintiff's disingenuous arguments that it was possible that other inmates created and possessed this document,[20] do not alter the fact that defendant Fauss's findings were supported by "some evidence."  *See Superintendent v. Hill*, 472 U.S. at 457 ("The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board.  Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary

---

[19] *See also  Monier v. Holt*, 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D. Pa. Dec. 21, 2005), *aff'd*, 259 Fed. Appx. 518 (3d Cir. 2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson*, 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd*, 242 Fed. Appx. 19 (4th Cir. 2007), *cert. denied*, 554 U.S. 922 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 341 n. 3 (W.D.N.Y. 2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson*, 2:06CV019, 2006 WL 618124, at *2 (E.D. Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

[20] At his deposition in May 2010, plaintiff contradicted his testimony at the disciplinary hearing by admitting that he filled out the seized UCC document.  (Pltf. Dep. at 53-56).

hearing.").

## 2.   Other Due Process Objections to the Second Hearing

The plaintiff's other claims do not require extended discussion. His conclusory allegation that defendant Fauss had "his mind made up" is insufficient to create an issue of fact that the hearing officer was not impartial, given that the transcript establishes that plaintiff received a full and fair hearing.[21] The first and second misbehavior reports involved plaintiff's possession of different UCC documents in different places at different times; in any event, double jeopardy protection does not apply to prison disciplinary proceedings.[22]

The hearing officer correctly determined that it was irrelevant when the confiscated UCC document was filled out because the plaintiff was charged and found guilty of continuing to have constructive possession of the document after the DOCS rules on UCC materials were changed and after plaintiff was given a direct order not to possess those documents. Plaintiff's conclusory claim notwithstanding, the hearing officer clearly made a written statement of his findings and the supporting evidence,

---

[21] *See, e.g., Bunting v. Nagy,* 452 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989)).

[22] *See, e.g., Porter v. Coughlin*, 421 F.3d 141, 142 (2d Cir. 2005) (*Hudson v. United States*, 522 U.S. 93 (1997), does not affect this Circuit's pre-*Hudson* conclusion in *United States v. Hernandez-Fundora*, 58 F.3d 802 (2d Cir.1995), that criminal prosecutions and prison disciplinary proceedings based on the same conduct do not implicate double jeopardy concerns.); *Lisbon v. Goord*, 02 Civ. 3567, 2003 WL 1990291, at *2 (S.D.N.Y. Apr. 29, 2003) (holding that double jeopardy protection does not apply in the context of two successive disciplinary hearings allegedly involving some of the same conduct).

which were also recited on the record during the hearing.  (Fauss Decl., Exh. A, Dkt. No. 88-6 at 8 & Exh. B at 17).

### D.    The Third Disciplinary Hearing

As discussed above, a piece of plaintiff's mail was opened by defendant Ciotti on May 29, 2009, pursuant to a mail watch order previously issued by Superintendent Woughter.  The envelope was addressed to plaintiff's brother, but contained letters for forwarding to others, one of which appeared, to Lt. Ciotti, to include written instructions for filing UCC statements on plaintiff's behalf.  (Ciotti Decl. ¶¶ 9-14 & Exh. C, Dkt. No. 88-4; St. Louis Decl., Exh. B at 17-18, Dkt. No. 88-9 at 38-39).[23] Based on this correspondence, Lt. Ciotti issued a third misbehavior report against plaintiff, charging him with "kiting" correspondence,[24] in violation of DOCS Rule 180.11; "soliciting" goods and services in violation of Rule 103.20; and failure to obey the Superintendent's May 19, 2009 written order not to possess or attempt to file UCC documents, in violation of Rule 106.10.  (Ciotti Decl. ¶ 16 & Exhs. D, E).

On June 8 and June 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to the May 29th misbehavior report.  At the hearing,

---

[23] The copy of plaintiff's mail, attached as Exhibit C to the Ciotti Declaration, does not appear to include anything resembling written instructions regarding UCC forms.  However, during the disciplinary hearing, Lt. Ciotti read from the correspondence and quoted additional statements, not reflected in Exhibit C, which do appear to be instructions regarding UCC forms. Plaintiff made did not object to the recitation of the content of his letters at the disciplinary hearing.  (St. Louis Decl., Exh. B at 17-18).  The court concludes that the copies of the letters provided with defendants' motion are incomplete, and will rely on the transcript of the hearing with respect to the full content of the seized correspondence.

[24] "Kiting" mail refers to attempting to surreptitiously forward prohibited correspondence to someone other than the addressee on the envelope, through third parties.  (St. Louis Decl. ¶ 6).

plaintiff acknowledged prior receipt of inmate assistance, but asked for three witnesses not previously requested–the hearing officer, Capt. St. Louis; Superintendent Woughter; and Lt. Ciotti.  The latter two witnesses were called to testify.  Capt. St. Louis declined to call himself as a witness, because he had no firsthand knowledge of the relevant events; however, he agreed to answer any questions plaintiff had of him, as the hearing officer.  (St. Louis Decl. ¶ 12 & Exh. B at 2-3, 20).

During the hearing, plaintiff denied his guilt.  However, he acknowledged writing the confiscated correspondence and possessing and using various UCC materials for what he claimed were innocent business purposes.  (St. Louis Decl., Exh. B at 7-9).  Plaintiff admitted receiving the May 19, 2009 memorandum from the superintendent, ordering him not to possess or file UCC documents without prior authorization, and acknowledged seeking, but not receiving, the superintendent's permission to use UCC materials.  (St. Louis Decl., Exh. B at 9-10).  Plaintiff claimed that he did not require authorization from the superintendent for activities involving the UCC, and he challenged the legitimacy of the revised DOCS rules on UCC materials.  The hearing officer advised that he would apply the DOCS rules that were in force, and that, if plaintiff wanted to challenge the rules, he needed to do so outside of the hearing process.  (St. Louis Decl., Exh. B at 10-11, 19).  At the conclusion of the hearing, Capt. St. Louis found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU, with a related loss of privileges, and the loss of 12 months of good time.  (St. Louis Decl. ¶¶ 17-18 & Exh. A, Dkt. No. 88-9 at 4, 7).

Those penalties were later reduced, on appeal, to six months.   (Bezio Decl. ¶ 56 & Exh. C, Dkt. No. 88-2 at 12, 37-38).

Many of plaintiff's claims involving the third disciplinary hearing relate to the alleged impropriety of the interception of his mail and the use of it against him in support of the charges.  (Complaint, Dkt. No. 1-3 at 19).  As discussed above, even if the confiscation of plaintiff's mail had violated DOCS regulations or federal constitutional standards, that would not have provided a basis for challenging the use of the mail at the disciplinary proceeding.  Plaintiff also has argued that his due process rights were violated in connection with the third disciplinary hearing because (1) the hearing officer was biased and frequently interrupted the plaintiff as he tried to present his defense; (2) the mail clerk, who intercepted the correspondence on which the charges were based, did not testify; (3) plaintiff was not allowed to see, at the hearing, the correspondence that formed the basis of the charges; and (4) the hearing officer did not make a written statement of the evidence supporting his finding of guilt.[25]  (Complaint, Dkt. No. 1-3 at 18-22, 36-39; 8/3/2009 Addendum, Dkt. No. 15 at 2-5; 8/4/2009 Addendum, Dkt. No. 16-2 at 2-3).

## 1.    Alleged Bias of Hearing Officer

After reviewing the transcript of the disciplinary hearing, the court concludes that Capt. St. Louis displayed remarkable patience and gave the plaintiff considerable latitude in presenting his defense.  The plaintiff argued, at length, about extraneous

---

[25] Plaintiff's last, conclusory claim requires little discussion, as it is completely inconsistent with the written statement of reasons prepared by Capt. St. Louis, which he also read into the record.  (St. Louis Decl., Exh. A, Dkt. No. 88-9 at 8 & Exh. B at 23-24).

matters, such as the merits of the first two misbehavior reports issued against plaintiff and plaintiff's objections to DOCS policies relating to the UCC, after the hearing officer made clear that he was bound to apply the applicable DOCS policies unless plaintiff was able to challenge them in another forum.  (St. Louis Decl., Exh. B at 6-7, 11, 15, 21).  Capt. St. Louis appropriately admonished plaintiff when, for example, he claimed bias and threatened to sue after defendant St. Louis explained that plaintiff's questions for witnesses had to be filtered through the hearing officer.[26]  (St. Louis Decl., Exh. B at 15-16, 20).[27]  Plaintiff's conclusory claim that the hearing officer was biased and impeded the plaintiff as he tried to present his defense, is flatly contradicted by the record of the hearing and is not, based on the authority cited above (in note 21), sufficient to create a disputed issue of material fact.

### 2.    Alleged Failure to Call Witness

Plaintiff claims that the hearing officer refused to call, as a witness at the disciplinary hearing, the mail clerk who intercepted the correspondence which Lt. Ciotti read into the record when he testified.  The court finds no indication in the transcript of the hearing that plaintiff ever asked that this witness be called.  (St. Louis Decl., Exh. B at 3).  In any event, the only reasons plaintiff alleges for calling the mail clerk relate to his objection that the seizure of his mail was contrary to DOCS policies.

---

[26] *See Baxter v. Palmigiano*, 425 U.S. 308, 322-23 & n.5 (1976) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing and the hearing officer may rely upon evidence not presented at the hearing).

[27] Capt. St. Louis reasonably admonished plaintiff for being "disrespectful" and "defiant," based on several instances where plaintiff refused to answer questions or interrupted the hearing officer.  (St. Louis  Decl., Exh. B at 17-18, 19-20, 21-22).

(8/3/2009 Addendum, Dkt. No. 15 at 2).  As discussed in section VI., above, the alleged impropriety of the confiscation of the mail would not support any defense to the related disciplinary charges, and would not be relevant to the hearing. Nonetheless, the hearing officer allowed questioning of Lt. Ciotti on the subject of the justification for opening plaintiff's mail.  (St. Louis  Decl., Exh. B at 20).  Even if plaintiff had requested that the mail clerk testify, the hearing officer could have refused the request, consistently with due process requirements, because the evidence would be irrelevant and cumulative.[28]

### 3.    Alleged Failure to Allow Plaintiff to Review Confiscated Mail

Plaintiff claims that he was not allowed to see the confiscated mail that was the basis for the charges against him, and thus, was not able to comment on this evidence. The hearing transcript indicates that plaintiff was shown a copy of the confiscated mail during the hearing and commented on it.  (St. Louis  Decl., Exh. B at 8-9).  When Lt. Ciotti testified, he quoted extensively from the letters, and plaintiff commented further on them.  (St. Louis  Decl., Exh. B at 17-19).  The court finds no indication in the record that plaintiff objected to the manner in which the confiscated letters were introduced at the hearing.

In any event, if plaintiff had not been shown the letters and objected, the hearing officer could have reasonably declined to provide the actual contraband to

---

[28] Although due process includes a right to call witnesses, this right is also not unfettered. *Alicia v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005).  This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity.  *Id.*  (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)).

plaintiff for security reasons.[29]  Given that plaintiff was the admitted author of the confiscated correspondence, reading the letters to him gave him an adequate opportunity to confront the evidence.[30]

## VIII.  Plaintiff's Cross Motion

To the extent plaintiff has moved for summary judgment on his due process claims, that motion must be denied.  For all the reasons outlined above, no reasonable fact finder could conclude, on the basis of the record presented, that the defendants violated plaintiff's due process rights in connection with the three disciplinary hearings.

## IX.   Qualified Immunity

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine:

---

[29] An inmate has a right to call witnesses and present evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  *Wolff v. McDonnell*, 418 U.S. at 566.

[30] Plaintiff has also claimed that he requested and was denied a copy of the mail watch order, pursuant to which his mail was seized.  (Complaint, Dkt. No. 1-3 at 19).  Again, the court finds no indication that plaintiff requested this document at the hearing.  (St. Louis Decl., Exh. B at 20).  If the document had been requested, it could have been reasonably withheld for security reasons.  Moreover, as indicated above, because plaintiff had no legal basis for objecting to evidence at the hearing even if it had been seized pursuant to an invalid mail watch, the mail watch order could have been excluded as irrelevant and unnecessary.

"(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 812, 818 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases").  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  This court need not address qualified immunity with respect to most of plaintiff's claims, as to which the court concluded that plaintiff's constitutional rights were not violated.

The court finds that the defendants who applied the amended DOCS policies with respect to UCC materials in connection with the three disciplinary hearings

against plaintiff are entitled to qualified immunity, to the extent plaintiff claims those policies were invalid under the First Amendment.  As discussed in section V.A. above, in the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed the issue, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment.

Moreover, the defendants who applied the amended DOCS rules to plaintiff would also be entitled to qualified immunity, to the extent plaintiff claims the amendment process denied him adequate notice of what conduct would be subject to discipline, because of the direct, personal notice plaintiff received that his continued possession of UCC materials would be prohibited.  Per section V.C. above, it was not clearly established as of 2009, whether direct personal notice of the effect of changes in DOCS disciplinary policies would overcome a vagueness objection to DOCS efforts to revise disciplinary rules by amendments to DOCS directives and the issuance of explanatory memoranda.  *Young v. Goord*, 192 Fed. Appx. at 34 (officials who personally notified an inmate, before he was disciplined, of the change effected by a revised directive and an implementing memorandum on a DOCS disciplinary rule, could reasonably believe that their application of the new disciplinary policies was consistent with due process standards articulated by the Second Circuit, because the officials did not expect the inmate himself to reconcile the text of these different documents).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 88) be granted and plaintiff's complaint be dismissed in its entirety; and it is further

**RECOMMENDED**, that plaintiff's cross motion for summary judgment (Dkt. No. 89) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated:  July 20, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge